Salvador Rivera et al., Petitioners and Appellees, v. Hipólito González, Mayor of Arroyo, Respondent and Appellant.

No. 5311.   Argued December 23, 1930.—Decided January 30, 1931.

*José Ruiz de Val* and *Fernando Beiró Rovira* for appellant.   *Bolívar Pagán* for appellees.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

The Mayor of Arroyo was impeached and removed from office by the municipal assembly on the grounds specified in the third, fourth, sixth and seventh of a series of charges as follows:

"3.—The said mayor authorized the payment of fifteen dollars of the public funds of the municipality, which was made to Alfredo Cintrón, for a political trip from Arroyo to San Juan, in the month of May, 1929, the said payment being detrimental to the municipality, and the trip foreign to it.

"4.—The said mayor attempted to embezzle the public funds of the municipality, authorizing the issuance of an order for plumbing material to be purchased from the firm of Juan Covas & Co., of Arroyo, requesting delivery as was made, charging to the municipal funds the following articles on account of 'Maintenance and Repair of the Aqueduct,' 60 feet of pipe ⅛" in diameter; 1 tap (*llave de paso*); 1 faucet (*llave de chorro*); 1 T joint; 6 elbows; 1 straight joint.   All of these materials were used in the private home of Eugenio Silva, located at a place called 'Ensanche' and after the materials had been used in said house when he was accused of this before the Grand Jury of the District Court of Guayama, he had the order canceled, destroying the evidence against him which is an offense punishable under the Criminal Laws of Puerto Rico.   The order for the materials referred to was issued on July 2, 1929.

"6.—The said mayor has not rendered the annual report either to the municipality of Arroyo or to the Governor of Puerto Rico, as provided by Article 29 of the Municipal Law in force, thus having neglected to fulfill his duty.   The preceding charges show manifest negligence on the part of the mayor in the exercise of his office, causing serious and irreparable damages to the municipality.

"7.—The said mayor in a drunken state, attended a ball held by prostitute women, on July 15, 1929, at a place known as 'Pasto en Arroyo, P. R.' exposing himself to public criticism, which involves tremendous moral turpitude and disqualifies him for the high office as mayor of this town, entrusted to him.   Besides he is frequently seen totally drunk on the streets of the town and so enters his

office, when he chances to visit the office during working hours. This makes him unable to render intelligent services to the people of the municipality."

These charges were prefered in April, 1930, some eleven months after the date of the incident referred to in charge three.

Prior to May, 1929, the mayor had formulated certain charges against an employee of the municipality. A public hearing followed and there was some friction between the mayor and the assembly. The president of the Socialist party telegraphed the president of the assembly inviting that body and the mayor to come to San Juan. Both the mayor and the president of the assembly understood that the purpose of the trip was to discuss the situation existing in Arroyo as a result of the charges presented by the mayor. The mayor, the president of the assembly and five members of that body, on arriving in San Juan, were referred by the president of the Socialist party to the president of the Pure Republican party who was also prominent in the affairs of a coalition of the two parties. He asked the mayor to withdraw the charges against the municipal employee in order to avoid further publicity and for the good of the party.

The situation which culminated in a trip to San Juan was a local, administrative, municipal matter. The visitors did not attend any political convention, caucus or committee meeting. The tangle in municipal affairs did not cease to be a municipal matter merely because the mayor and members of the assembly were invited to come to San Juan by the leader of one political party and political influence was brought to bear on the mayor by the leader of another political party in the form of an appeal to party loyalty. The refusal of the mayor to yield under such pressure was at least consistent with the theory on which he charged the cost of transportation to the municipality and with his contention throughout the impeachment proceeding that the trip to San Juan was on business of the municipality.

The Municipal Law (Session Laws 1928, pp. 334, 356, 358) authorizes the impeachment and removal of a mayor by the assembly for the following specified causes:

"(a) Any act constituting felony;

"(b) Any act constituting a misdemeanor and implying moral turpitude;

"(c) Manifest negligence in the performance of the duties of his office, or immoral or incorrect conduct in the exercise thereof."

It may be conceded that the item of fifteen dollars was a needless, injudicious and improper expenditure of municipal funds. Technically, perhaps, the authorization of such payment by the mayor amounted to "incorrect conduct" in his official capacity. It was at most, however, a mistake of judgment betraying a lack of discrimination as to what constitutes legitimate traveling expenses chargeable to the municipality. A series of such incidents might justify a removal from office. Construing the words "incorrect conduct" in connection with the context we do not find any satisfactory evidence of an intention on the part of the Legislature that a single more or less doubtful and insignificant instance of the sort in question should operate that result.

Certainly the mayor was not guilty of a felony, or of a misdemeanor implying moral turpitude. There is no adequate basis for an imputation of *mens rea*. There was no "manifest negligence in the performance of the duties of his office" because there was no question of inadvertence, oversight or neglect. The action of the mayor was intentional and deliberate. To say that it amounted to "immoral or incorrect conduct" would be to set up a standard of moral rectitude that was not in the mind of the Legislature.

Pedro W. Rodríguez testified that he was in the office of Santiago Alvarez, the secretary-auditor, when Silva came and told Alvarez that "Don Hipólito González ordered him to issue an order" for certain materials, that Alvarez asked for what purpose the materials were to be acquired, and

Silva replied that they were for his house; that witness was present when Silva came with the order signed by the mayor who was at home; that witness was present when Silva came to ask Alvarez for the order; that witness saw the order on the day that it was issued, the order, issuance of which had been directed by the mayor; that Alvarez did not want to give the order and told Silva to go back to the mayor and ask him for what purpose the materials were wanted, to what account they should be charged; that Silva then went away with the order, and returned with it to Alvarez; that when Silva brought the order the first time it was not signed by the mayor; that Silva first came, returned, and Alvarez told him to go back, and he came again and again went back, and then brought the signed order.

Alvarez took the stand four times as a witness for the prosecution and twice as a witness for the defense. If he said anything about Silva's visit or about any conversation between him and Silva in the presence of Rodríguez or otherwise it has escaped our attention. Rodríguez was a municipal employee who had been discharged by the mayor and reinstated by the district court, or else had some sort of a suit against the mayor pending in the district court at the time of the impeachment proceedings.

Silva testified that he needed some pipes and the mayor gave him an order for them and that the mayor signed the order. Asked whether the order stated that it was for his house or for the municipality he answered, "It was for my house." Then came the following question and answer:

"Q.—Then he told you that he would give an order for those materials to be used in your house?
"A.—Yes, sir."

From the testimony of this witness on cross-examination we take the following luminous extract:

"J.—When you went to look for the materials at don Galo's or don Hipólito's, in what conversation did you engage?

"A.—Not any.

"Don Hipólito: I need some pipe.

"That was all, and he gave it to me.

"He gave it to you at once?

"Yes, sir.

"And you used it in your house?

"There it is.

"Tell me one thing, Silva, did you tell the Grand Jury of Guayama the same thing that you now relate?

"Yes, sir.

"Exactly?

"Exactly."

The mayor says that Silva brought the order to him at his home for his signature at a time when he was confined to his bed, and told him that the municipal plumber needed the supplies. He also says that on his recovery he inquired of the plumber as to what use had been made of the materials and on ascertaining the facts, paid the bill out of his own pocket, severely rebuked Silva and threatened to prosecute him, but later relented. Silva was not called in rebuttal. Save as above indicated in the excerpt from Silva's testimony, the mayor's statement is not directly contradicted by that of any other witness or by any documentary evidence. It is not pretended that this account which amounted to seven dollars and some cents was ever paid out of municipal funds and the mayor's statement as to payment by him is fully corroborated.

The order was canceled by a note or memorandum endorsed thereon. It was not destroyed. There was no reason why it should not have been canceled either before or after the Grand Jury began its investigation some six months later. The Grand Jury after investigating the matters involved in charges three and four as presented in two bills, refused to indict the mayor.

The mayor's statement implies that Silva came to him as the bearer of a message from the municipal plumber. If Silva's cryptic account of his conversation with the mayor

can be regarded as a contradiction of the mayor's statement it must also be regarded as a contradiction to the same extent of Rodríguez's testimony, concerning Silva's repeated visits to the mayor. The testimony of Rodríguez as to the conversation between Silva and Alvarez is not corroborated either by Alvarez or by Silva. Statements made by Rodríguez concerning other matters are substantially contradicted by Alvarez.

Conceding for the sake of argument that the testimony of Rodríguez and of Silva sufficed to establish a *prima facie* case of attempted misappropriation of municipal funds, the evidence as a whole is not clear enough nor strong enough to sustain such a charge.

The municipality is not shown to have been prejudiced in any way by the mayor's failure to make his annual report. Aside from any question as to the merits of the explanation offered by the mayor, his negligence in this regard was neither so manifest nor of such a serious character as to justify his removal from office.

The evidence shows that the mayor is addicted to the use of liquor. It does not satisfy a fair and impartial mind that as a result of this habit or otherwise he has been guilty of "manifest negligence in the performance of the duties of his office, or immoral or incorrect conduct in the exercise thereof." In company with the mayor of another municipality he visited the dance referred to in the seventh charge. There is some conflict in the testimony as to the duration of his visit and as to his condition and his conduct on this occasion. Beyond the fact that he had some conversation with the president of the municipal assembly, who was a member of the orchestra, there is nothing to indicate that the visit was of an official character or in any wise connected with the discharge of official duty.

We can not and do not of course, commend the conduct of the mayor in connection with any of the matters herein

discussed. Such conduct, however reprehensible, is not a sufficient ground for removal under the provisions of the Municipal Law.

The decision of the municipal assembly must be reversed.